My name is Brian Pulsos. I represent Raymond Grower in our DA group, the appellants, and I would like to reserve five minutes of my time for rebuttal. You've got a swap there. Just keep talking. Thank you. Unlike the other cases, we raised several issues on appeal, and I'd like to start first with the standing issue. Excuse me? The standing issue. Standing. Right at the beginning of the trial. You mean capacity to sue? Yes. Go ahead. Okay. At the beginning of the trial, we stood up and said, Your Honor, the plaintiff, Stephanie Downey, of the Maryland Corporation, his charter has been torphed. They cannot sue or be sued. It can't even do an appeal. And the district court said? The district court said, This is a first-day trial. We will take evidence. That's the whole trial, and I'll reserve the issue. And ultimately, the district court said? Ultimately, the district court denied the motion. Because? Because... It was untimely. It was untimely.      It was untimely. It was untimely. It was untimely. It was untimely. It was untimely. It was untimely. It was untimely. It was untimely. At the very beginning of the case, before my client was even a party, when the complaint was filed, there was a motion to dismiss, claiming that the plaintiff was in default. The plaintiff secured his default, got back into his standing, and the case proceeded. That was in 98. In 1999, we took the deposition of the plaintiff's president and said, According to the state records, your corporation has been defaulting. He said, Well, I don't know anything about that.      And we had a second time. And we had a second time. And we had a second time. that it was true because he said it was.   The convenience conditions, they tried to put them on notice of the issue. The third time was the first they had tried. Now, yes, the Judge... So what? So the plaintiff can't proceed with this case, so he's forfeiting? Well, the case law, though, says, and these are actually based, Judge Ferguson's decision, but land law and the circuit statues that the specific negative affirmment, which has to do with capacity to sue, must be made, quote, in the response of pleading, or by motion before pleading. Did you make a specific negative avert about capacity to sue? No, we did not. Doesn't that make what the district court did absolutely improper? It wasn't timely, so... Or, at least not an abuse of discretion? Well, at the time we filed our answer, we were not an initial defendant. At the time we filed our answer, they had capacity. They were in good standing. They just let their capacity become forfeited as the case went on. But you knew about it long... I mean, it's one thing to be in the position, find out that they left capacity lapsed, and go into court and say, look, we're bringing it now as early as time we can. But he just stood there and told us, oh, well, now we knew about it way back in 1999. 1999. And then didn't raise it before the court until the start of crime. And let me tell you, district judges are very unhappy when you file things on the day of trial, things that you could have filed much earlier. It's sort of... For how long... Not welcome. For how long did you know about the lack of capacity in Robinwood before you made this motion? Well, we just found out the week before trial. The one thing you do... When you say we, who's we? Council, my law firm. When was the deposition? 1999. And when was the time? September 2001. So when you say we, you don't include the people who were in the deposition? I'm sorry? Who was in the deposition? Plaintiff's counsel, plaintiff's president, and defendant's counsel. Okay, so when you say we didn't know until the week before trial, who are you including? I included we, the defendant, and the defendant's law firm. Was the defendant not represented in the deposition? He was represented. By counsel? Yes. So was he hired? I don't know. He went to volunteer counsel. They came on the street and said, I'm just going to go and do a deposition for this guy. So I don't understand. If his lawyer is there at the position and gets the information on his deposition, then that means the defendant doesn't know it? And it's not binding on future counsel? No, what I'm saying is when Grower's counsel took the deposition of Bob Colton in 1999, we asked him, according to the records of the state of Maryland, your corporation, the plaintiff, is in the fall. He said, I don't know anything about that. You'll have to ask my lawyer. He was on notice of the issue the second time at that point. In October of 2000, the corporate charter was forfeited. There's nothing that could have been done to provide it. We got to trial in September of 2001. Well, I hear you telling me usually months before the trial that there was a capacity problem. What am I missing? No, I didn't know until I checked the record right before trial, right before trial. But weren't you on notice early on in the deposition that the capacity problem existed? Yes. And then you waited until the day of the trial to make the motion? Yes. That sounds like a sandbag. Well, it wasn't a sandbag because it was the third time the issue had been raised with the other side. Well, whether it's a sandbag or not, how do they persuade us that this was an abuse of the district court discretion? This is not a jurisdictional issue. It's not like saying you can raise it on appeal or any time there will be a trial and then it stops proceedings. This is a kind of issue that can be waived by not raising it properly. It seems to me you admitted that this was not raised properly. And now you have to argue to come from the position of having to argue that the district court abused its discretion when you admitted that you or your predecessor counsel didn't do what he was supposed to. How are you going to do that? We raised it at trial and on appeal because it was the third time during the course of the case that the issue was raised. I understand. But how are you going to persuade us that that was an abuse of discretion for the district court to say, look, you did not comply with our rules. You could have complied with our rules. You could have filed it long before. And I exercised my discretion not to pursue that motion when it was not on your age. Isn't that what the district judges do all the time? Yes. Do you want to move on to your next issue? I would like to. The next issue is the copyright registration itself. The case was about the coupon books that had a number of coupons. The district court found there was registration? There was testimony that there was registration? There was. If you go back and look at the testimony, Mr. Colton testified about three different corporations he was operating. In the next few pages, the question was, did you file a copyright registration for each one of these books? The answer was yes. I asked him on cross-examination, will you testify about different corporations and different businesses? Let me ask you a question. Did Stephanie, the Maryland corporation, ever file a copyright registration? His answer was, I have no idea. So you've got conflicting testimony between Mr. Colton. And the trial judge resolved the conflicting testimony. That's the way it always happens at a trial. He does. Was there any documentary evidence offered by anybody that said there was registration? No. Exhibits 1, 2, and 3 of the complaint were the copyright registrations. They were never offered or admitted at trial. So if they had submitted the registrations at trial, we'd cross-examine them. The registrations say that you're asking for copyright protection for original text, compilations, and artwork. But his fair statement that we filed a copyright registration doesn't answer the question, what are you actually seeking to protect? Is it the compilation? Is it the artwork? Or is it the logo that you're provided by the coupon provider? You're moving territory here slightly. The question was whether there were copyright registrations filed and whether the district court had them. But there's clearly erroneous and silver coating, right? Right. And you're saying that it was wrong. It is. That all the district court did was credit somebody's testimony over somebody else's. Yes. But the court has to find what was registered. Is it the book itself? Is it the compilation? Or is it the parts of the book? Now, even if the judge found that there was a copyright registration, that moves us on to the next issue, and that is, are these books themselves, either in component parts or as a compilation, is subject to copyright protection? In order to be subject to copyright protection, there has to be at least some minimal level of originality or creativity. And what happens is you have a book with a total value of $1,500, and somebody takes a bunch of contracts off the shelf, puts them in a book form to where they total $1,500. The logos that are in the book, the Dairy Queen logo, the two-for-one language is not subject to copyright. Mr. Colton himself testified. His only concern was that he had a contract for each one of those coupons. When I asked him at trial, do you care at all about the organization of the coupons, he said, no, all I really care about is that I have a contract. There is no original thought that went into the compilation of the coupon books themselves. If Mr. Colton has testified, I have an idea, I want to put a dinner coupon book together and put it in some form of order, put the salad, entree, dessert in some form of order. Was this put to the district court in a way where it had to rule on whether he was registered, was copyrightable? Yes. At the end of the plaintiff's case, we made a motion to the Smith, and we said, Judge, they didn't get the copyright registrations in his evidence, so we don't know what is being copyrighted. Couldn't you have given the person the evidence yourself? I could have, yes. But you're saying that there wasn't material before the district court judge from which he could make an informed ruling as to whether they were copyrightable. Yes. Number one, he didn't have information in front of him to show that there was a, what exactly was copyrighted. He had a statement from Mr. Colton that said, I filed a copyright registration. He had, on cross-examination, a direct question, did the plaintiff, Stephanowski, the Maryland Corporation, because we're talking about other entities, ever file a copyright registration? He said, I have no idea. The way to resolve that would have been for Plaintiff's Counsel to submit the copyright registrations themselves. It sounds to me like a lot of the stuff you're arguing here, the kind of stuff you've argued in trial, in fact, inferences to be drawn from testimony, inferences to be drawn from the failure to submit better proof when you submit weaker proof. Sure, registration certificates would have been better, but those are the kind of things that get resolved at trial. And from there, of course, you have the district judge who looks at all the stuff and who begins it. You have to persuade us that, depending on the issue, there was no evidence to support filing. That's very hard to do, and I'm yet to get there. I think the best way to look at this is the coupon book itself. If you take one, two, or twenty coupon books and you put them side by side, they're all the same. If you take Stephanowski's coupon book itself and you look at each component part, you cannot find a component part that is original to Stephanowski and subject to copyright restriction. The logo... But we have held, in a number of cases, that you don't have to have originality in every particular part. If you actually take a number of generic parts and just put them together the right way, you can have a copyrighted word. And Feist tells us you don't need a lot of creativity for... You don't need a tiny bit of creativity for something to become copyrighted. But I understand that's what Feist said, and that's what we argue to the district court judge. The question is, we never get up to that fine, minimal level of creativity. And the way we get to that finding is Mr. Colton's testimony itself. Mr. Colton... Why can't the district judge just look at the thing and say, look, it's not a phone book. This is not one of those things where it's all listed alphabetically, with all the names in one column and the numbers in the next column, and there's nothing to it. Oh, it's just a big list, which is what Feist was about. This is a question of how you lay out the coupons, how big you make them, what size you make them, how you... There's various judgments that have to be made, and coupon books can be made in different ways. They can be made with carats, they can be made with long, they can be made square, and almost... There's not a lot of creativity involved in making those decisions, but it's just a problem, just a matter.  what about the compilation, the arrangement? He said, any arrangement in coupon books are standard in the industry, therefore no originality. What about your coupon books, Mr. Colton? Do you care, or do you have any input into the arrangement? His answer was, I couldn't care less. What happened is there was simply a mechanical compilation of books that totaled up to either $1,500, $2,500, or $3,000, or whatever the amount is. So in the factual findings, number 71, Stepanat assembled, coordinated, collected, selected, and or arranged the formats, coupon book sizes, coupon sizes, expiration dates, language, colors, fonts, perforations, number of coupons per page, and micro-settings of Stepanat's coupon book. That's not supported by the record. It is not. And it's specifically rejected by Mr. Colton's own testimony. Your Honor, it's a file of evidence. Would you like to have a look at it? Thank you. We'll give him a call to the counsel. Good afternoon, Your Honor. My name is Neal Tomlinson from the Kobiega-Tomlinson firm in Las Vegas, representing Stepanat. You look very lucky to win this case, Your Honor. Well, Your Honor, my partner tried it. I didn't have a hand in trying it, so I can't take it. I didn't mean you personally. Your Honor, I just want to make a couple of points. First of all, your partner needs to be congratulated. Well, he's one of the Nevada's top trial lawyers, my mentor. It's a surprise to me, this one. There are a lot of close issues that could easily have gone the other way. Your Honor, I'll tell you exactly why those issues didn't go the other way. That's because Mr. Holtis had one major problem at trial. He had a client who had absolutely no credibility, and that was the difference of trial. This was a bench trial, as you know, and Judge Hunt was in the best position to look at these coupons. He compared every one of them, and he listened to the testimony. He listened to the testimony of Bob Fulton, and he listened to the testimony of Raymond Brower, and that's how he made a decision. There was a huge problem with Mr. Brower's credibility, and that's obvious in any part of the record whatsoever. Well, what tantalizes me is counsel's statement that Mr. Colton gave away the copyrightability issue by saying, there's no compromises. I didn't do anything. It's all standards. It's just industry junk, and I couldn't care less. That's not what happened. I'm surprised at this. And actually, while we're on that, let me address that right now. If you look at the record, Volume 2, those certificate of registrations were stipulated looking at Volume 2, base page number 469. This is the joint pretrial order. Stipulated exhibits. Two, the three purported registrations of copyrighted taxes exhibits the plaintiff's second amended complaint. These will be listed as joint exhibits, 7 through 9. Now, if you look at Volume 1, the complaint is in Volume 1 of the Expert Compressor, and all three certificates of registrations are in there. Those did come in there. Those were before the court at the trial. I'm sorry, what page is that? On the joint pretrial order, or the... I have the, you know, the Volume 1, the complaint. It would be Volume 1, page 29. Page 29? Yes. Where did you say this in your brief? You are, I think it's in the brief. I can't point to the page right now. I can look if you'd like, but this information clearly came into the record. It was stipulated there. You were responding to counsel's argument here, I gather, was what you're doing. He said if only these things were attached, it would have been fine. If only these things were attached to the complaint, only the exhibits, everything would have been fine. So you are answering by saying they were part of the pretrial order. Well, I just want to make sure there's no mistake. These clearly came into evidence, and I sat the last couple of days and read every word of that transcript, because, as you know, I didn't participate in the trial at all. But I know for a fact that somewhere in that transcript, they even talked about those coming into evidence. But they were stipulated before trial even, with this joint pretrial order. They clearly were into evidence, and you know, those registration certificates, those are primary evidence of ownership. So the ownership issue is really a non-issue here. There was plenty of evidence. I must tell you, though, this could have been made clearly in the briefs. It came as a surprise to me. That's why I asked you. I mean, we really pay attention to briefs. It would have been nice to have it right in the briefs. It's a big fight over the registrations, and I sort of baffled as to what the evidence was. And then I assume you're clear enough to ask the other side if that's the case, that he was stipulating an evidence in the briefs right away. Not I knew at all. They understand, of course. We also read all of these bottoms of the appendix page by page, but I almost forgot. Well, no, that's the thing about the appendix. I mean, we do rely on the briefs. The briefs are a roadmap. As a roadmap to these materials, which we appreciate, but it's a thousand blinks. It's very hard to find them. Understood. I'd like to address just for a minute the independent compilation issue, the fact that these coupon books were compilations and therefore protected. You know, this was a question that I was proud to ask you. We skillfully diverted attention by pointing to them, because it was especially the figures. And I think the question was, didn't Mr. Colton give away the game by saying, I didn't give a darn about this. This is a bugger agency. No, I think that those statements are taken out of context. I think Mr. Colton is a businessman. He's not a lawyer. What he was saying was, I rely on other people to do that. I rely on people to make the... I hire graphic artists, in fact, to make these coupons. He was concerned more of running the business aspect, not the creativity part. However, there's clear testimony in the record on the compilation, and one of those elements that you know is selection, coordination, and arrangement. Mr. Grower, when he came into this whole thing, he had no experience in the coupon book industry at all. And one of the number one things to know in the coupon industry business is where to put these coupons within the book itself. On the stable is where you want to put your best ones, the prime coupons, in the back and in the front. That is organization, that's coordination, and that is part of why these coupon books should be protected, and why they are protected, and why Judge Hunt found that they were protected. I'm sorry, you are now citing what when you give us a lesson in how to do coupon books? Price. It's very useful. Price is one case. No, no, no, no, no. Price set the standard, but I thought you were referring to evidence in the record that tells us what you just represented, that the arrangement of a coupon book requires skill and creativity. And I was just asking, what are you citing? Assuming this is not just a person who asked me on giving us this new experience. No, I'm telling you this by reading the transcript. I don't have a page right in front of me, but... Can you tell us a witness? Yes, Bob Colton. Bob Colton. The guy who said I don't care much about meters? Your Honor, I was taking out of context. If you were to read some of the testimony, I would suggest you look at Bob Colton's testimony, and you look at Raymond Rourke's testimony, but especially Raymond Rourke's cross-examination. That's the whole case. And also the deposition of a dreaded end of Whitfield, who was a former graphic artist. Now, one point I do want to make... When you read the transcript front to back, you didn't make any notes? I didn't make a lot of notes. You don't have them, of course, with you today, huh? Unfortunately, I can't cite you to the exact page, no. Can you give us an approximate page? You showed us the codebook, right? Is it in the back? Is it across? It's in direct, Mr. Colton's direct testimony. Okay. Is it in there? On this, do you want me to move on, or do you want me to stay on that point, Your Honor? Move on. As far as the creativity element, there was a graphic artist department within Steppenhouse. Why would you ever have two graphic artists working for you if there was no element of creativity, like Mr. Grower wants you to believe there was? It's a copy. It's a copy of other people's work. No, that was Mr. Grower's, it was not Stephenhouse's. I mean, I don't know. I would like to jump back just briefly to the capacity issue. I just want to make two points. The first one is that it appears that Grower is trying to put the burden of capacity on Stephenhouse. Well, in fact, that's incorrect. If you look at the FDIC de-calculating case, they have the burden to raise the capacity issue. It's a defense. And they clearly did not raise that on time and fashion. If you don't timely raise it, you waive it. That's kind of what an old judge used to say in Seattle. Don't shoot a dead duck twice. I appreciated that, Josh. One last point, a few seconds left, on the jurisdiction issue. I don't think this has been discussed yet. But jurisdiction, the court has jurisdiction, excuse me, jurisdiction. We rely on Columbia Pictures and the Panavision cases. I think that the key is... It's another mighty close one that's your partner pulled out. It's like my partner, yeah. I was interested that the district court judge gave absolutely no reason to pull out the federal jurisdiction. The district court denied the motions. And I wasn't involved in those motions, Josh. Well, your partner was, and you're stuck with that. I am stuck with it. The defendant was never stepped foot in the matter, right? As far as I can reflect. He signed a purchase order that was sent to him from Western Mailing. Western Mailing was the distribution company that Stephanow first used, but then after Grower stole the coupon disk and started printing his own, they also used Western Mailing. Western Mailing is located in Las Vegas. He didn't use Western Mailing. Whenever he called this company, he said, is that not right? Well, I submit that that's not right. Because why then would Mr. Grower have to sign the authority on that? He signed a document. And I can point you to the exhibits. This is exhibit 22, 22A, and 23 at the trial. And this is specifically in Raymond Grower's cross-examination. Are they in the excerpts? The reference is in the transcript to Raymond Grower's cross-examination. Clearly, he admitted on cross-examination that he signed off on this Western Mailing and Kavanaugh Press purchase order that authorized the printing and the mailing of that. And while we're talking about that, I think it's very important. You used an interesting, sir, word, signed off on. Is that the same as signed? He signed it. The name is signed on there. It was addressed to him, and he signed it. There was a space for his signature. You've seen that? I've seen his testimony that he signed it in the excerpts of record that are before you. Raymond Grower's cross-examination. We don't have the purchase order with the signature. I don't believe it's in the excerpts, Your Honor. Trust, but verify. What is the point of signing the purchase order? I'm not quite sure I understand. Usually what happens is you get a purchase order, and then you fill it. I'm just not seeing what this signing is. I think it's important, Your Honor, because it shows that he purposely directed activity within the state of Nevada. On top of knowing that Mr. Colton was moving his business to Las Vegas, he also signed a purchase order that clearly was authorizing the distribution and mailing of these coupon books through Las Vegas, Nevada. He purposely ejected himself into Nevada. That's why we have jurisdiction here. I think you misspoke yourself. You said Colton. I'm sorry, Grower. Thank you, Your Honor. I would like to just address briefly the Corbin case that Grower relies on here. That's the case of those Swedish doctors who published some articles in the journal, and those journals apparently made their way to California. So they were trying to get jurisdiction over them in California. Grower had substantially more activity in Nevada than the Swedish doctors did in California. For one, there wasn't any purposeful availment on the part of the Swedish doctors in that Corbin case. So I think that's distinguishable. Here we had specific acts by Grower. We had the signing of the document, the knowing and utilizing of Western Mailing, who was also stepping out as a prior distribution company. So we had purposeful availment there, and I think that's just the point I wanted to make on that. You know, it's not clear to me. I'm still trying to figure out what this transaction with Western Mailing was, and how the signing of the purchase order had an effect. There was not much... I mean, Western Mailing was a separate company. That's correct. And one could easily do business with them, and yet have no contacts from Nevada left there on jurisdiction in this case. I mean, it's not like they opened an office in Nevada and they say, well, you've got personal jurisdiction for all purposes. Well, I think it's very important. I think for two reasons. First, if those coupon books aren't mailed out, where's the harm, where's the confusion? They never get distributed. So you've got the printing, that's one thing. It happened in another state. But the actual thing that causes the harm are when these coupon books are distributed out. And so that's a key hub, and a key piece of this whole puzzle, is the distribution, the mailing. And the mailing occurred in Nevada? That's right. What happens is the printer ships the coupon books to the distribution facility, which is Western Mailing, and that's located in Las Vegas. So the actual coupon books that are being produced by VAL, they actually go through the state of Nevada. That's why that issue is so important. Okay, I didn't... I lost my second part of that, but I think that made my point. Just two quick points. First on the damages issue, one of the issues raised by Crowder was that the award of damages was not justified. In this case, I would say, we had unrefuted expert witness testimony by a CPA who had reviewed Step It Out's historical profits and many, many documents relating to the sales that were made to Mueller, and that testimony was unrefuted because, as you know, prior to trial, their expert witness was excluded. And so let me jump to that issue real quick, the exclusion of defendant's expert. This was a problem. There was an issue with that expert that came up, even before the issue with his list of casings, cases that were required by Rule 26. There was an issue. He was holding himself out as a CPA, and he had no authority to do that. He didn't have the CPA designation. And so that was how that issue first was raised, that he wasn't qualified to even be an expert in this case because this case required the skills of the CPA. So what happened is there was a motion that was filed to exclude this expert. He was a professor of economics, real estate... a professor of real estate finance at UNLV. He was unqualified, so they got this motion, and he never did produce the correct list of cases as required. And he had no justification for that, for Rule 37. He managed to irk the district judge. I'm sorry? There's no doubt about it. He managed to irk the district judge. Absolutely. Exactly the opposite of what your partner did. That's why I raised the CPA issue, Your Honor, because I think that that was part of the reason. But wasn't what he did close enough? No, it wasn't. I mean, he did come up with a list. He came up with a list, Your Honor, and he had 20 cases on it. And then later on, he tried to come up with a list that had 101-plus cases on it. He added 100 cases. That's a lot of cases. And that is prejudicial to the plaintiffs. And so that's why that ruling to exclude was correct. It's correct under Eldridge v. Pauletta-Bell. It's a pretty drastic remedy to exclude. I mean, basically, we are cutting the heart out of the parties' case. We exclude the expert. And I'm not – it doesn't strike me that this was clearly a non-amusement discretion. This is a correspondence. Well, it was not an amusement discretion, Your Honor. Clearly, there's case law to support it. The rules themselves support it. Didn't the expert say, well, I don't even have access to a complete list? Well, and that's why it's important, because he said from his deposition that he can't possibly come up with a list, and then once he becomes aware that it catches on, that, hey, I might get excluded here, then he tries to come up with a list, and then naturally we have a list. So, you know, is that list accurate? It's not. And even if you do say, okay, well, it's not – Well, I can certainly see Mr. Court saying, look, you came up with a long list late, and therefore defense counsel – defense counsel – defense counsel, rather, is going to have to work extra hard to track this down. And you know what? We're going to make you as a defendant pay for that, because it happens so late, they have to hire extra help from any defense counsel, or his partner will have to give up a weekend tracking it out, and by now they're going to make you pay for it because of the inconvenience. Why would you not have given the more appropriate remedy, rather than saying you go to trial, basically, without an expert? They sort of might say you go to trial, but you're not really going to be able to prove anything. You're going to have a few old experts, except that the other guy doesn't get an expert. So you're not fighting one guy with a sword, and the other guy just stands there. It strikes me as a little – I can see where the district court must be, and justify the unhappiness with the expert, but punishing the property like this, by cutting them out of their case, strikes me as excessive. Well, I think it's important to consider the time, and this was late in the game, and the discovery was close. So it wasn't like we had lots of time to do discovery on this issue. So I think that place – The discovery could have been reopened for this purpose. I'm just sitting here thinking about what the district court could have done, if it had been tested, and maybe there's probably tests, but I would have thought the test would be, you've got both sanctions, but the sanctions have to be geared to the transgression, and they have to be commensurate. And to some extent, they have to be least restrictive, in the sense that you don't nuke somebody's case, but you could achieve all the results you want to, that you need to achieve, in terms of fairness, by just giving them some extra money. Say, okay, put a few more associates on this, you've got to do it in a hurry, so the other side's going to have to pay for it, you try to tie it down, and I can't imagine that your firm could not have tied down some of the cases in a matter of a few days, if it hadn't decided to put all the necessary resources into it. How hard can it be? Well, I think it certainly could have been done, but... If it could have been done, why shouldn't it have been done? Especially if we were to say, this could have just cost, I mean, we realize that doing things in a hurry... Let's say the guy who provides the list to begin with, he would have had no choice, but to do it at your client's expense. Let's say he'd come up with 120 cases to begin with, and give you all the information, he would have had to do it. Your client would have had to pay for it. So let's say now, you've got it in my age, we understand that it's more expensive than doing it in a hurry, and my guy will stick it to the other side, I can understand that. But, he'll ask for it. I mean, that's hard to justify. Your Honor, my time's up. No, no, no, your time's up. The history's fine. So you just always get up when you're getting beat. The red light goes on. Let's go to the meeting. With all due respect, Your Honor, if you're going to allow that, you might as well take the federal rules and throw them out the window, because why do we have Rule 26, and why do we have Rule 27, if we're not ever going to use them? Let me ask counsel, That's your answer? That's my answer? Well, now you need an extra time? Okay, I'm sorry, yes, go ahead. Is this not the expert that you said was not qualified because he wasn't in the country? That's absolutely right. Okay, maybe we're just talking at the whim. Well, if there's another justification, if you want to rely on another justification, that's fine, we can talk about that. But I've heard you trying to justify this on the basis of sanctions, essentially a sanction for coming up in the list. Right. Is that just like what you mean? If you want to walk away from that one and pick up, you know, that action, well, that's fine. I don't know, it's your choice. How did that person know? I thought I addressed that. I wasn't trying to do anything. It certainly couldn't have been that way. Anything can be done. I mean, if something has to be done, it can be done. So, you know, I can't stand here and tell you, you know, couldn't we have investigated these actual cases? No, no, no, wait a minute. Just hold on a minute. District Court gave mixed cases for making its decision. Now, if one of the reasons is inadequate, what does that do to the District Court's decision? I mean, you and I are both the same. Well, the District Court had, you know, this reason which is self-assertion, and another reason which is self-assertion. We don't have to rely on that one because we don't have to rely on them. But I have the impression that the District Court was moved to strike the expert as much by the failure to provide the list as by that person. That was a necessary ground for the decision. I don't dispute that, Your Honor. Well, it was necessary, and it's not a ground to defend here or able to defend here, then it seems to me that we may have an abuse of discretion. No, I think clearly there is an abuse of discretion here. A reversal on the issue is not warranted. The key thing is it's prejudicial to the plaintiff. When you're preparing for trial, and then all of a sudden you've got an expert who had 20 cases, and then the next day he's got 120 cases, what do you have to do? Do you have to hire another 20 lawyers to help you get ready for trial? At least. I think the sanction was appropriate. You've got five minutes on the market. You have 18 seconds at least, something like that. Just to revisit the originality of the issue for a second. Before you revisit the originality of the issue, let me ask you a question. Are you Brian Balthus? I am. Is your bar number 002720? Yes. Are you the person who signed this joint pretrial order of 77 pages approved by the trial court? Yes. And in there does it say, the party stipulates that the following exhibits may be entered into evidence at trial, reading page 27 of 77, number 2. The three purported registrations of copyrights attached to the exhibits to plaintiff's second amendment complaint. These will be listed as joint exhibits 7-9. When counsel mentioned that, I thought back to that point, and I don't remember whether they were in there or not. If they're in there, then I'll certainly withdraw. Well, in your brief, Stepanak never put the purported copyright registrations themselves into evidence. Is that wrong? That is wrong. That is wrong. Stepanak never put the actual purported copyright registrations themselves into evidence, page 9. Is that wrong too? That is wrong because there is a stipulation. So you misrepresented the record to us. Your Honor, we did the trial because they were not an exhibit at trial. They were not submitted. They weren't part of the joint pre-trial order. They were joint exhibits by your stipulation. Yes. And you made a large measure of your brief out of this argument that these were never admitted in evidence and there was no evidence to support all these findings. That's dead wrong. I am wrong. Is that the answer? Why did you do that? Because I didn't go back and read the pre-trial order. Is everything else in your brief wrong too? No. How do we know that? Because everything else is signed in the record. I went back through the trial record. I did not look at the joint pre-trial order. Is the pre-trial order to provide for automatic admission of the things in there or simply say they're admissible, they've moved? In other words, they still have any objections in case they finally choose to move or not. Your Honor, I don't remember the exact terms. You don't understand pre-trial orders? I do. What do they do? Well, they set the stage and set the exhibits for trial. Exactly right. And the judge signed up on that. That's the evidentiary basis for this bench trial. But it could do one of two things. One of them, it could say these things come in. Or it could simply say these things need to be admissible. It moved. My record shows that. It's not. What is it? It is wrong, Your Honor. It's wrong. I would like to spend a moment on the damages issue. And that is when Stephanow's TPA expert got on the stand and testified about the damages that were caused by the copyright infringement. He had a list of all of the coupon books that Stephanow and National Savings Corporation have submitted and all the profits from those coupon books. When I asked him on cross-examination, there are three coupon books that issue here. There are other coupon books listed in the compilation. There's an $1,800 book. There's a grocery book. There are other books up there. Did you go back and determine whether the coupon books that issue are in your compilation damages? And he said, no. What he had computed was, in essence, a loss of Mr. Lohr's business over a period of years. He did not compute the damages from the copyright issue. That would mean that the court would have to find that the defendant, Mr. Brower, had interfered at a contractual interference point and took all the business away from Mr. Mohler. The fact is, when Stephanow moved to Nevada, Brower had no employment contract. He had no non-compete contract. He had no non-disclosure. He went out and got a customer that used to be Stephanow's customer. And he used and sold them products that were not subject to copyright. The issue at trial was whether these items were subject to copyright protection. The court found they were. The court found that there were damages as a result. I get you. But these are two, um, two specific cases where it's not copyrighted, right? And it's still the property of Mr. Colton. And then, you know, how much of it gets stolen. Isn't that right? Well, it is not property of Mr. Colton. It is a generic coupon book that has coupons from different coupon providers. The real potential problem for my client was, if the court found that there was interference with the coupon providers themselves, the Mary Queens and the Burger Kings that had contracts with the plaintiffs. Well, if Mr. Colton, or his company, had had a negotiation with the deputy coupon providers, a negotiation with the proprietors, a negotiation with the unions, what would you have done? Yes. But when I asked Mr. Colton on the examination, on the cost of the examination, did you have any problems with the coupon providers? His answer was, we had very little. There were a few problems. There were some angry letters, and no damages, and certainly nothing that could be too hungry and proud. Because your clients' coupons were bogus. I'm sorry? Your clients' coupons were bogus. No, no, they weren't bogus, Your Honor. His testimony was that when he worked for Stefanow, Stefanow had contracts with coupon providers. When he went and did the second set of coupon books for National Savings Corporation, his testimony was that National Savings Corporation had contracts. There is deposition testimony there from National Savings Corporation that it was their responsibility to go get the contracts, and if they didn't have contracts, those contracts shouldn't be included in the book. Now, the plaintiff has settled his claims with National Savings Corporation. It wasn't Mr. Grauer's job to go out and get the coupons. In fact, there haven't been any damages claimed from those coupon providers themselves. I give you my time, Your Honor. Thank you. Thank you. Cases are used and submitted. I give you my time, Your Honor. Thank you. I give you my time, Your Honor. Thank you. I give you my time, Your Honor. Thank you. I give you my time, Your Honor. Thank you. The Court is adjourned.
judges: B. Fletcher, Kozinski, Trott